## ST. CLAIR *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 1062. Submitted March 5, 1894. — Decided May 26, 1894.

An indictment for murder which charges that the offence was committed on board of an American vessel on the high seas, within the jurisdiction of the court and within the admiralty and maritime jurisdiction of the United States, sufficiently avers the locality of the offence.

An indictment which charges that A, B, and C, acting jointly, killed and murdered D, is sufficient to authorize the conviction of one, though the others may be acquitted.

A charge in an indictment that the accused did then and there, piratically, wilfully, feloniously, and with malice aforethought, strike and beat the said D, then and there giving to said D several grievous, damaging, and mortal wounds, and did then and there, to wit, at the time and place last above mentioned, him, the said D, cast and throw from and out of the said vessel into the sea, and plunge, sink, and drown him, the said D, in the sea aforesaid, sufficiently charges that the throwing into the sea was done wilfully, feloniously, and with malice aforethought.

An indictment being found after the trial jury had been properly discharged,

the court may order a *venire* to issue for persons to serve as jurors, and may further direct the marshal to summon talesmen.

Rule 63 of the court below is not inconsistent with any settled principle of criminal law, and does not interfere with the selection of impartial juries.

Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal facts that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence.

On the trial under an indictment charging that A, B, and C, acting jointly, killed and murdered D, without charging that they were co-conspirators, evidence of the acts of B and C are admissible against A, if part of the *res gestœ.*

A party may show that the testimony of one of his witnesses has taken him by surprise, and that it is contrary to the examination of him preparatory to the trial, or to what the party had reason to believe that the witness would testify; or that the witness had been recently brought under the influence of the other party and had deceived the party calling him.

The certificate of the vessel's registry and proof that she carried the flag of the United States were properly admitted on the trial of this case, and established a *prima facie* case of proper registry under the laws of the United States, and of the nationality of the vessel and its owners.

When no exception is taken on the trial of a person accused of crime to the action of the court below on a particular matter, that action is not subject to review here, although the statutes and practice of the State in which the trial takes place provide otherwise.

In criminal proceedings all parts of the record must be interpreted together, so as to give effect to every part, if possible, and a deficiency in one part may be supplied by what appears elsewhere in the record.

In February, 1893, the grand jury, empanelled in the District Court of the United States for the Northern District of California, returned into that court an indictment charging that Thomas St. Clair, Herman Sparf, and Hans Hansen, mariners, late of that district, on the 13th day of January, 1893, with force and arms, on the high seas, and within the jurisdiction of the court, and within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State of the United States, in and on board of an American vessel, the bark Hesper, belonging to a citizen or citizens of the United States, whose name or names are or were to the grand jurors unknown, did, with a certain instru-

ment or weapon, (the character and name of which were to the grand jury unknown,) then and there held in the hands of one of the defendants, (but of which particular one was to the grand jurors unknown,) "then and there piratically, wilfully, feloniously, and with malice aforethought strike and beat the said Maurice Fitzgerald, then and there giving to the said Maurice Fitzgerald several grievous, dangerous, and mortal wounds, and did then and there, to wit, at the time and place last above mentioned, him the said Maurice Fitzgerald cast and throw from and out of the said vessel into the sea, and plunge, sink, and drown him the said Maurice Fitzgerald in the sea aforesaid; of which said mortal wounds, casting, throwing, plunging, sinking, and drowning the said Maurice Fitzgerald in and upon the high seas aforesaid, out of the jurisdiction of any particular State of the United States of America, then and there instantly died.

" And the grand jurors aforesaid, upon their oath aforesaid, do say, that by reason of the casting and throwing the said Maurice Fitzgerald in the sea as aforesaid, they cannot describe the said mortal wounds or the character and nature of said weapon or instrument. And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Thomas St. Clair, Herman Sparf, and Hans Hansen, him the said Maurice Fitzgerald at the time and place as aforesaid, upon the high seas as aforesaid, out of the jurisdiction of any particular State of the United States of America, in and upon the said American vessel, within the jurisdiction of the United States of America and of the admiralty and maritime jurisdiction of the said United States of America and of this court, in the manner and form aforesaid, piratically, wilfully, feloniously, and with malice aforethought, did kill and murder, against the peace and dignity of the United States of America, and contrary to the form of the statute of the said United States of America, in such case made and provided."

It was also averred that the Northern District of California was the district into which St. Clair, Sparf, and Hansen were first brought after committing said offence.

The indictment was based upon section 5339 of the Revised ..

Statutes, providing among other things that "every person who commits murder . . . upon the high seas or in any arm of the sea, or in any river, haven, creek, basin, or bay within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State; or who, upon any such waters, maliciously strikes, stabs, wounds, poisons, or shoots at any other person, of which striking, stabbing, wounding, poisoning, or shooting such other person dies, either on land or at sea, within or without the United States, shall suffer death."

On motion of the district attorney the indictment was remitted for trial to the Circuit Court, where the defendants were arraigned and severally pleaded not guilty. Rev. Stat. § 1039.

Subsequently the pleas of not guilty were withdrawn and the defendants jointly demurred to the indictment upon these grounds: 1. That it did not state facts constituting a public offence. 2. That it was uncertain in not showing upon what portion of the high seas the alleged offence was committed or which one of the defendants committed the alleged assault, or whether one or more of the defendants committed any of the acts alleged against them.

The demurrer was overruled, and the defendants being again arraigned pleaded not guilty.

A motion for a separate trial of the defendants was made and granted, and the trial of St. Clair was had separately.

At the beginning of the trial the accused challenged the panel of the trial jurors and the challenge was denied.

The facts in reference to the challenging of jurors are as follows:

On the 1st day of February, 1893, a day of the term of the Circuit Court, commencing November 28, 1892, an order was made and entered directing a venire to issue summoning fifty persons to serve as trial jurors, returnable February 14, 1893. Pursuant to that order a venire containing fifty names drawn from the regular jury box of the court was issued for those persons to act as petit or trial jurors. At the time of the drawing there were at least three hundred names in the jury

box, but of those a part were names remaining after previous drawings at former terms of the court, and the others were names placed therein by the proper officers just previous to the drawing of said venire to make the whole number of names up to and including the full number of three hundred. The persons whose names were contained in that venire were duly summoned and appeared on the 14th day of February, 1893, with the exception of three, who had in the meantime been excused by the court. Thereafter, on the 2d day of March, 1893, a day of the term commencing on the 1st Monday of February, 1893, the following order was made and caused to be entered : " There being no further business to be brought before them it is ordered that the trial jury of said Circuit Court, for the present February term thereof, be discharged and paid for their attendance." On the 6th day of May, 1893, the indictment against St. Clair, Sparf, and Hansen was, as already stated, remitted to the Circuit Court from the District Court.

On the 29th day of May, 1893, a day of the February term, after the discharge of the regular jury for the term, the court entered an order directing a venire to issue for fifty persons to serve as trial jurors, and returnable on Wednesday, June 7, 1893. Pursuant to that order a venire containing the names of fifty persons drawn from the regular jury box of the court was issued for those persons to serve as trial jurors in the Circuit Court, and to appear on the 7th day of June, 1893. At the time of the drawing last mentioned there were at least three hundred names in the jury box, but of those a part were names remaining after the last drawing, and the others were names placed therein by the proper officers just previous to the drawing of the last-mentioned venire to bring the whole number in the jury box up to three hundred. The persons whose names were contained in the last-mentioned venire (such as were summoned and not excused) appeared and attended the court in obedience to its summons. Thereafter on June 14, 1893, a day in the February term, the circuit judge presiding, the case against St. Clair was called for trial.

The defendant challenged and objected to the general

venire and panel of jurors on the ground that the regular venire of jurors for the term had been discharged, and that the court had exhausted its powers to summon a jury to act during the term after the order for a jury of February 1, 1893, and the order discharging the jury of the 2d of March, 1893; and on the further ground that the statutes had not been complied with in summoning jurors, and that at the time of the drawing of the names of jurors the jury box had not been refilled with three hundred new names, but a portion of the names therein were names remaining after previous drawings. The court overruled the objection and denied the challenge, to which rulings of the court the defendant objected.

Thereupon twelve persons who had been drawn and summoned as aforesaid were regularly called into the jury box, but before being sworn to answer questions touching their qualifications, the attorneys for the defendant objected to and challenged the panel thus called on the ground urged against the general venire. The court overruled the objection and denied the challenge, to which the defendant excepted.

The jurors were then sworn to answer questions touching their qualifications to serve as jurors. After the first juror had been examined as to his qualifications and passed by the United States and the defendant for cause, the court announced that the juror must be sworn to try the case, unless challenged by the United States or the defendant, and that this rule would be enforced as to each subsequent juror. The defendant claimed the right to examine all of the jurors as to their qualifications before exercising the peremptory challenge, and excepted to the ruling announced by the court.

The defendant challenged each separate juror after he entered the box on the ground that the jury had not been properly drawn as hereinbefore stated, which challenge was denied by the court, and the several rulings of the court were excepted to by him.

The names of jurors summoned having become exhausted, after only eight had been examined, accepted, and sworn, the court ordered 25 talesmen to be summoned for June 15, 1893, to serve as trial jurors in the cause. On that day the defend-

ants objected to the last-mentioned venire, and to the tales-men, on the grounds offered to the original general venire or panel. This objection and challenge were overruled by the court, and the defendant excepted.

The defendant, also objected and challenged the talesmen on the ground that there was no jury regularly summoned to be filled by talesmen, and that the talesmen had not been summoned in conformity to law. This objection was over-ruled, and he excepted.

The defendant also objected to each separate talesman after he entered the box and was sworn, upon the grounds last mentioned, and the objection was overruled, to which he excepted.

After a jury of twelve had been empanelled and sworn to try the case, the same objection was repeated to the entire panel sworn to try the case, and the objection having been overruled, an exception was taken.

The material facts disclosed by the evidence are so fully and accurately stated in the brief on behalf of the govern-ment that we adopt the statement of the Assistant Attorney General, as follows:

"The Hesper was making the voyage from Australia to Honolulu. It left Newcastle on the 22d of December, 1892, with a crew consisting of fourteen persons. The ship's crew was divided into two watches, one called the starboard watch, which is the captain's watch; the other called the port watch, which is the mate's watch. The watches consisted of four hours at a time, except the afternoon watch, from 4 to 8 o'clock, which is divided into two watches of two hours each. The watches relieve each other every four hours. The man at the wheel strikes a bell for the watch to come on deck at 12, 4, and 8 o'clock. A watch is always called before 8 bells, which means 12 o'clock, 8 o'clock, and 4 o'clock. Every half hour is one bell. The seamen call each other and the officers call the officers. When one watch is performing duty the other watch is supposed to be sleeping during the day or night. On the 13th day of January, 1893, the starboard watch consisted of Maurice Fitzgerald, the second mate;

Thomas St. Clair, Herman Sparf, Hans Hansen, and Edwin Larsen. The port watch consisted of John Lucas, first mate; Thomas Green, Jens Olsen, Henry Westerlind, and Pandy Secaria.

"On the night of the 13th of January, 1893, John Lucas, the first mate, was called out at about five minutes to 12 o'clock, by Herman Sparf. He dressed, and as he was going on deck eight bells struck for 12 o'clock. He walked rapidly to the man at the wheel and asked where the second mate was. He called for him and received no answer. He went to the captain's cabin and reported that he could not find the second mate. The captain came on deck and inquired of the starboard watch, which had been on duty from 8 to 12 o'clock, if they knew where the second mate was who had charge of their watch; to his inquiry he received no reply. The carpenter was called on deck, and the search for the second mate was continued. The starboard watch, which had gone off duty at 12 o'clock, had gone below and was called again to the deck by the mate, and was not permitted to go to their bunks to sleep, but was required to remain on deck and go aft. The deck of the vessel was loaded with coal about ten or twelve feet high. The top of it was floored over with some hard wood and on top of that a deck was laid of two-inch planking.

"About twenty minutes past 12 o'clock the captain discovered blood on the deck; about seven or eight feet from the mainmast one spot of blood was about two and a half feet long. The next morning there was found on the edge of the gangway a narrow strip of scalp with a small piece of hair stuck together by blood attached to it. The hair was black, tinged with gray, and was recognized by the captain as the hair of the second mate who was missing. There was also found a broom covered with blood alongside the ladder; and beneath the bunk of St. Clair, the plaintiff in error, there was found a hatchet, which was greasy; and on the deck, near to where the blood was seen, there was found a wooden bludgeon. After the captain discovered the blood he called the starboard watch into the cabin. He saw blood on one of

the cheeks of Herman Sparf. The men all said they could not account for the blood on the deck; that they had heard nothing during their watch from 8 to 12. Herman Sparf said that he had seen the second mate go up the fore rigging, but had not seen him come down. The captain sent them to their bunks to go to sleep.

"Edward Larsen, a member of the starboard watch, relieved St. Clair at the wheel at 10 o'clock; the second mate was then close by the wheel when relieved by Larsen. St. Clair went forward on the deck. At that time the mate was aft. St. Clair returned and told the mate that something was carried away, and he went forward and the mate followed him. It was very dark at the time and that was the last Larsen saw of the second mate. Shortly after St. Clair and the second mate went forward Larsen heard a dog bark and a man 'holler.' At half-past 10 Captain Sodergren and his wife, who were together in the cabin, heard the dog bark and two sounds like a human voice in distress. The barking of the dog and the sound of the voice were heard also by John Langlais, the ship's carpenter, and M. P. Luck, the steward, but they only fix it between 8 and 12 o'clock. Herman Sparf, who was of the starboard watch and whose place was on deck, came to the forecastle, where the port watch were sleeping, and called Jens Olsen at a quarter to 11 o'clock to give them a hand to throw the captain overboard. And about the same time he woke up Thomas Green and said something to him which Green could not understand. Green went on deck in his underclothing; as he was going on the starboard side he saw Hansen with a broom in his hand, and when he went on the deck-load he found St. Clair, Hansen, and Herman Sparf standing there. He said to St. Clair: 'What's the matter, what's the news?' St. Clair said: 'We want you to give us a hand to throw the old man overboard,' referring to the captain. So I says: 'How are you going to get him on deck?' and he says: 'One of us will let go the peak halyards and one of us will go around to the wheel, and when he comes on deck then will be the time to do away with him.' So I says: 'Where's the second mate?'

He says: 'He has gone overboard; can't you see the blood on the deck?' So St. Clair says: 'What do you say?' and I says: 'Wait until I go and put a pair of pants on.'

"Jens Olsen did not go on deck when called by Sparf at a quarter to 11, and did not see St. Clair until he went on deck at 12 o'clock, when he saw him walking on the deck-load on the starboard side, aft of the mainmast.

"The hatchet, which was found under the bunk of St. Clair, was identified by Hong, the cook, as the one which St. Clair had borrowed from him at half-past 6 o'clock the evening before, to cut wood with.

"At half-past 10 o'clock, on the night of the homicide, St. Clair had on a blue serge coat, buttoned up, at the time he came back to the wheel and told the mate that something had been carried away, and he and the mate went forward together. When Captain Sodergren saw St. Clair on the deck, helping the mate to light the lamp, about a quarter after 12 o'clock, he had only a shirt on — a gray shirt; the captain saw no blood on it, and he went into the forecastle to discover whether there was blood on the men's clothing. Pandy Secaria had left St. Clair at the wheel about 9 o'clock that night; he saw him next after 12 o'clock, when the first mate was inquiring: Where is the second mate? He saw him again a few minutes later, after the starboard watch had gone below, coming out of the forecastle; he had changed his clothes; he had got a shirt on and no pants; he jumped inside the forecastle; he had a bundle of clothes in his hand and he chucked them overboard.

"Thomas Green saw St. Clair about 12 o'clock that night, or a little after, have some clothes and throw some clothes overboard. He had some clothes rolled up in a bundle and threw them overboard in front of Green. St. Clair's hands had blood on them at that time.

"After the mate had disappeared that night, and after St. Clair, Sparf, and Hansen were placed in irons, Sparf said to Edward Larsen, in Swedish, not to say anything about it. And the same night the plaintiff in error, St. Clair, had said to Thomas Green, in the forecastle, 'Say nothing about it, Tom.'"

In the progress of the trial there were numerous exceptions by the accused in respect to the admission of evidence.

The defendant asked but one instruction, which was in these words : "Manslaughter is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. The jury are instructed that under the indictment in this case the defendant, St. Clair, may be found guilty of manslaughter, and if, after a full and careful consideration of all the evidence before you, you believe beyond a reasonable doubt that the defendant is guilty of manslaughter you may so find your verdict." This instruction was refused, but no exception was taken at the time to this action of the court. The court charged the jury upon the law of the case, saying among other things : "Manslaughter is the unlawful killing of a human being without malice, either express or implied. I do not consider it necessary, gentlemen, to explain it further, for if a felonious homicide has been committed of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder." No exception was taken to the charge of the court or to any part of it.

The jury returned the following verdict : "We, the jury, find Thomas St. Clair, the prisoner at the bar, guilty." Upon that verdict the defendant, after motions for new trial and arrest of judgment had been overruled, was sentenced to suffe. death.

*Mr. J. F. Smith* and *Mr. F. J. Kierce* for plaintiff in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

Mr. Justice HARLAN, after stating the case, delivered the opinion of the court.

I. The objection, upon demurrer, that the indictment did not sufficiently show on what part of the high seas the offence charged was committed, is met by the averment that the offence was committed on board of an American vessel, on the

high seas, within the jurisdiction of the court and within the admiralty and maritime jurisdiction of the United States, and not within the jurisdiction of any particular State of the Union. Nothing more was required to show the locality of the offence. In *United States* v. *Gibert*, 2 Sumner, 19, 86, which was an indictment for robbery on the high seas — a capital offence and piracy under the act of 1790, 1 Stat. 113, c. 9 — the point was made that the indictment was defective in not stating the particular place on the high seas at which the robbery was committed. Mr. Justice Story overruled the objection, observing that "the averment in the indictment that the offence was committed on the high seas within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State, is sufficient certainty for all the purposes of the indictment and trial, without any other particular designation or averment of the locality of the offence. . . . The doctrine of *venue* in indictments at the common law is inapplicable to cases of this sort. . . . The reason of the common law for laying the *venue* so particularly in offences on land does not in any manner apply to offences on the high seas; for no jury ever did or could come from the *visne* or *visinage* on the high seas to try the cause; and no summons could issue for such a purpose."

Equally without merit is the objection that the indictment does not show which one or more of the defendants committed the alleged assault. The indictment charged that the defendants St. Clair, Sparf, and Hansen, acting jointly, killed and murdered Fitzgerald. The offence was one which in its nature might be committed by one or more of the defendants. Proof of the guilt of either one would have authorized his conviction and the acquittal of the others. Archbold's Cr. Pr. & Pl. 176; 2 State Trials, 526; *Young* v. *McKay*, 8 T. R. 98, 105.

The only question that could arise as to the sufficiency of the indictment is suggested by the words, " and did then and there, to wit, at the time and place last above mentioned, him, the said Maurice Fitzgerald, cast and throw from and out of the said vessel into the sea, and plunge, sink, and drown

him, the said Maurice Fitzgerald, in the sea aforesaid." These words, it is said, do not necessarily import that the casting and throwing the deceased into the sea was done wilfully, feloniously, and with malice aforethought. But they cannot properly be separated from those which show the nature and effect of the assault. The words immediately preceding show that the accused did "then and there piratically, wilfully, feloniously, and with malice aforethought, strike and beat the said Maurice Fitzgerald, then and there giving to the said Maurice Fitzgerald several grievous, dangerous, and *mortal* wounds." The latter words and those first above quoted are connected by the conjunctive "and," and should be construed together; and, so construed, it is clear that the words "piratically, wilfully, feloniously, and with malice aforethought" refer not only to the striking and beating of the deceased, whereby mortal wounds were inflicted upon him, but to the casting and throwing of him into the sea, whereby he was drowned. Any other rule of construction would compel the pleader to indulge in too much repetition. *Heydon's Case,* 3 Rep. 7.

II. The objections made to the jury were also properly overruled. It was clearly competent for the Circuit Court to make the order of March 2, 1893, discharging the trial jury for that term, there being no further business to be brought before the court. The indictment having been found after the regular trial jury had been discharged, the order of May 29, 1893, directing a venire returnable June 7, 1893, for fifty persons to serve as jurors was entirely proper. The names of the persons thus summoned to appear and who appeared were drawn from the regular jury box, in which at the time were at least three hundred names. But the list of the whole body of jurors was exhausted when only eight jurors had been accepted. Thereupon the marshal was directed to summon, and did summon, twenty-five talesmen. All this was in conformity to law. By section 804 of Revised Statutes of the United States, it is provided that "when, from challenges or otherwise, there is not a petit jury to determine any civil or criminal cause, the marshal or his

deputy shall, by order of the court in which such defect of jurors happens, return jurymen from the bystanders sufficient to complete the panel." And this section was neither expressly, nor by implication, repealed by the act of June 30, 1879, c. 52, § 2, 21 Stat. 43; nor did that act "touch the power of the court whenever, at the time of forming a jury to try a particular case, the panel of jurors previously summoned according to law is found for any reason to have been exhausted, call in talesmen from the bystanders to supply the deficiency." *Lovejoy* v. *United States*, 128 U. S. 171, 173.

III. By Rule 63 of the court below, it is provided that "in all criminal trials the designation, empanelling, and challenging of jurors shall conform to the laws of this State existing at the time, except as otherwise provided by acts of Congress or the rules of this court; but a juror shall be challenged, or accepted and sworn, in the case as soon as his examination is completed, and before the examination of another juror."

This rule was enforced at the trial of this case. After the first juror was examined as to his qualifications, the court announced that he must be sworn to try the case, unless challenged by one party or the other — the accused claiming the right to examine all the jurors as to their qualifications before being required to exercise his privilege of peremptory challenge as to any of them.

This general subject was carefully considered in *Lewis* v. *United States*, 146 U. S. 379, and in *Pointer* v. *United States*, 151 U. S. 396, 407, 410, 411. Referring to section 800 of the Revised Statutes, and the act of June 30, 1879, c. 52, 21 Stat. 43, 44, we said in the latter case: "There is nothing in these provisions sustaining the objection made to the mode in which the trial jury was formed. In respect to the qualifications and exemptions of jurors to serve in the courts of the United States, the state laws are controlling. But Congress has not made the laws and usages relating to the designation and empanelling of jurors in the respective state courts applicable to the courts of the United States, except as the latter shall by general standing rule or by special order in

a particular case adopt the state practice in that regard. *United States* v. *Shackleford*, 18 How. 588; *United States* v. *Richardson*, 28 Fed. Rep. 61, 69." "In the absence of such rule or order," it was further said, "the mode of designating and empanelling jurors for the trial of cases in the courts of the United States is within the control of those courts, subject only to the restrictions Congress has prescribed, and also, to such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries for the trial of offences. . . . In some jurisdictions the mode pursued in the challenging of jurors is for the accused and the government to make their peremptory challenges as each juror, previously ascertained to be qualified and not subject to be challenged for cause, is presented for challenge or acceptance. But it is not essential that this mode should be adopted." Referring to certain observations of Chief Justice Tindal in *Regina* v. *Frost*, 9 Car. & P. 129, 137, it was further said : "At most in connection with the report of the case, they tend to show that the practice in England, as in some of the States, was to have the question of peremptory challenge as to each juror, sworn on his *voir dire*, and found to be free from legal objection, determined as to him before another juror is examined as to his qualifications. But there is no suggestion by any of the judges in *Frost's case* that that mode was the only mode that could be pursued without embarrassing the accused in the exercise of his right of challenge. The authority of the Circuit Courts of the United States to deal with the subject of empanelling juries in criminal cases was recognized in *Lewis* v. *United States*, subject to the condition that such rules must be adapted to secure all the rights of the accused. 146 U. S. 378."

Adhering to what was said in *Pointer's case*, that any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of his right of peremptory challenge, must be condemned, we hold that the rule adopted by the court below is not inconsistent with any settled principle of criminal law, nor does it interfere with the selection of impartial juries.

IV. Exceptions were taken, at different stages of the trial, to the admission, against the objection of the accused, of evi-. dence as to the acts, appearance, and declarations of Sparf and Hansen. These objections seem to rest upon the general ground that the indictment did not charge St. Clair, Sparf, and Hansen as co-conspirators. The evidence was not, for that reason, to be rejected. St. Clair, Sparf, and Hansen were charged jointly with having killed and murdered Fitzgerald. The acts, appearances, and declarations of either, if part of the *res gestæ*, were admissible for the purpose of presenting' to the jury an accurate view of the situation as it was at the time the alleged murder was committed. Circumstances attending a particular transaction under investigation by a jury, if so interwoven with each other and with the principal fact that they cannot well be separated without depriving the jury of proof that is essential in order to reach a just conclusion, are admissible in evidence. " These surrounding circumstances constituting part of the *res gestæ*," Greenleaf says, " may always be shown to the jury along with the principal fact, and their admissibility is determined by the judge according to the degree of their relation to that fact, and in the exercise of his sound discretion ; it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description." 1 Greenleaf, 12th ed. § 108. See also 1 Bishop's Cr. Pro. §§ 1083 to 1086. " The *res gestæ*," Wharton said, " may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander ; they may comprise things left undone as well as things done. Their sole distinguishing feature is that they should be the necessary incidents of the litigated act ; necessary in this sense, that they are part of the immediate preparations for or emanations of such act, and are not produced by the calculating policy of the actors. In other words, they must stand. in immediate casual relation to the

act — a relation not broken by the interposition of voluntary individual wariness seeking to manufacture evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act." 1 Wharton Ev. § 259, 2d ed. 1879.

V. An exception was taken to the mode in which the district attorney was permitted to examine one of the witnesses introduced by the government. The attorney announced that the answers of the witness had taken him by surprise, and asked that he be permitted to put leading questions to him. This was allowed, and we cannot say that the court in so ruling committed error. In such matters much must be left to the sound discretion of the trial judge who sees the witness, and can, therefore, determine in the interest of truth and justice whether the circumstances justify leading questions to be propounded to a witness by the party producing him. In *Bastin* v. *Carew*, Ryan & Mood. 127, Lord Chief Justice Abbott well said that "in each particular case there must be some discretion in the presiding judge as to the mode in which the examination shall be conducted in order best to answer the purposes of justice." The rule is correctly indicated by Greenleaf, when he says : "But the weight of authority seems in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what the party had reason to believe he would testify, or that the witness has recently been brought under the influence of the other party. and has deceived the party calling him. For, it is said, that this course is necessary for his protection against the contrivance of an artful witness, and that the danger of its being regarded by the jury as substantive evidence is no greater in such cases than it is where the contradictory allegations are proved by the adverse party." 1 Greenl. Ev. 12th ed. § 444 ; Taylor on Ev. 6th ed. § 1262 A ; *Regina* v. *Chapman*, 8 Car. & P. 558, 559 ; *Regina* v. *Ball*, 8 Car. & P. 745 ; *Clarke* v. *Saffery*, Ryan & Mood. 126.

VI. At the trial below the government, after identifying

by the proper officer the original register of the Hesper, which disclosed the names of its owners, but not their nationality, introduced the same in evidence, and also proved that the vessel carried the American flag. There was no direct proof as to the citizenship or nationality of the owners, and the accused objected to this evidence as immaterial and incompetent. The objection was overruled and an exception taken. The court held the certificate of registration, and the proof as to the flag carried by the vessel, to be competent evidence in the case.

The statutes of the United States provide that vessels built in the United States, and belonging wholly to citizens thereof, may be registered; that no vessel shall be entitled to be registered, or, if registered, to the benefits of registry, if owned in whole or in part by any citizen of the United States who usually resides in a foreign country, during the continuance of such residence, unless he be a consul of the United States, or an agent for and partner in some house of trade, or copartnership consisting of citizens of the United States actually carrying on trade within the United States; and that no vessel shall be entitled to be registered as a vessel of the United States, or, if registered, to the benefits of registry, if owned in whole or in part by any person naturalized in the United States, and residing for more than one year in the country from which he originated, or for more than two years in any foreign country, unless such person be a consul or other public agent of the United States. Rev. Stat. §§ 4132, 4133, 4134.

We are of opinion that the court below did not err in holding that the certificate of the vessel's registry, and its carrying the American flag, was admissible in evidence, and that such evidence made, at least, a *prima facie* case of proper registry under the laws of the United States and of the nationality of the vessel and its owners. " The purpose of a register," this court has said, " is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found." *The Mohawk*, 3 Wall. 566, 571. The object of the above evidence was, no

doubt, to meet any question that might arise as to the juris-
diction of a court of the United States to punish the particular
offence charged.   If the proof was unnecessary for that pur-
pose, it could not have prejudiced the accused.   If necessary,
it was *prima facie* sufficient to establish the nationality of the
vessel.   A vessel registered as a vessel of the United States,
is, in many respects, considered as a portion of its territory,
and "persons on board are protected and governed by the
laws of the country to which the vessel belongs."   1 Kent
Com. 26.

VII. One of the assignments of error questions the compe-
tency of the statement of the captain of the vessel — admitted
in evidence against the objections of the accused — that during
the voyage, and particularly on and for several days before
and after the night Fitzgerald was missing, he saw no vessels.
This evidence was clearly competent.   It bore upon the in-
quiry whether Fitzgerald was actually drowned or was alive.
If vessels were shown to have been in sight, at or near the
time of the alleged murder, the jury might have been left in
doubt as to whether he was rescued after being thrown into
the sea.   Direct and positive evidence as to the *corpus delicti*
was not required.   Wills on Cir. Ev. 179.   When the strict
rule, here claimed, was insisted upon in *United States* v. *Wil-
liams*, 1 Cliff. 5, 20, the court expressed its approval of what
was said by Mr. Justice Story in 2 Sumner, 19, 27 — where
counsel contended that there should be no conviction for
murder, unless the body was actually found — namely, that
" in cases of murder upon the high seas the body is rarely, if
ever, found, and a more complete encouragement and pro-
tection for the worst offences of this kind could not be in-
vented than a rule of this strictness.   It would amount to a
universal condonation of all murders committed on the high
seas."   The rule is illustrated by *Hindmarsh's Case*, 2 Leach's
Crown Cases, 3d ed. 648, which was an indictment for murder
upon the high seas.   The counsel for the prisoner in that case
contended that he should be acquitted on the evidence, because
it was not proved that the captain, the person alleged to have
been murdered, was dead, and " as there were many ships

and vessels near the place where the transaction was alleged to have taken place, the probability was that he was taken up by some of them and was then alive." It was left to the jury to say whether, upon the evidence, the deceased was not killed before his body was cast into the sea.

VIII. It is assigned for error that the court refused to give the instruction asked by the accused upon the subject of manslaughter, and said to the jury that if a felonious homicide had been committed, of which they were to be the judges from the proof, there was nothing in the case to reduce it below murder.

As there was no exception taken to the action of the court in these particulars, the error alleged is not subject to review, *Tucker* v. *United States*, 151 U. S. 164, 170, unless, as the accused contends, we are to be controlled, in such matters, by section 1176 of the Penal Code of California. That section provides: "When written charges have been presented, given, or refused, or when charges have been taken down by the reporter, the questions presented in such charges need not be excepted to or embodied in a bill of exceptions, but the written charges or the report, with the endorsements showing the action of the court, form part of the record, and any error in the decision of the court thereon may be taken advantage of on appeal in like manner, as if presented in a bill of exceptions." They also, by the same code, form part of the judgment roll. § 1207.

These provisions of the Penal Code of California do not control the proceedings in the Circuit Court of the United States sitting in that State. What is necessary to be done in a Circuit Court, even in civil cases, in order that its action upon any particular question or matter may be reviewed or revised in this court, depends upon the acts of Congress and the rules of practice which this court recognizes as essential in the administration of justice. Such is the result of our decisions. Rev. Stat. § 914; Act of June 1, 1872, c. 255, § 5, 17 Stat. 197; *Nudd* v. *Burrows*, 91 U. S. 426.; *Indianapolis and St. Louis Railroad* v. *Horst*, 93 U. S. 291; *Chateaugay Iron Co., Petitioner*, 128 U. S. 544, 553; *Southern Pacific Co.* v. *Denton*,

146. U. S. 202, 208; *Luxton* v. *North River Bridge Co.*, 147
U. S. 337, 338; *Lincoln* v. *Power*, 151 U. S. 436, 442. See
also *Logan* v. *United States*, 144 U. S. 263, 303.

IX. By the Revised Statutes of the United States, it is pro-
vided that " in all criminal cases the defendant may be found
guilty of any offence the commission of which is necessarily
included in that with which he is charged in the indictment,
or may be found guilty of an attempt to commit the offence
so charged; *Provided*, that such attempt be itself a separate
offence." § 1035. It is, therefore, contended that, as the
verdict was, generally " guilty," and did not, in terms, indi-
cate of what particular offence the accused was found guilty,
the judgment should have been arrested.

This contention cannot be sustained. We said in *Pointer's
case* that, while the record of a criminal case must state what
will affimatively show the offence, the steps without which
the sentence cannot be good, and the sentence itself, all parts
of the record must be interpreted together, giving effect to
every part if possible, and supplying a deficiency in one
part by what appears elsewhere in the record. 151 U. S.
396, 419. The indictment contained but one charge, that of
murder. The accused was arraigned and pleaded not guilty
of that charge. And while the jury had the physical power
to find him guilty of some lesser crime necessarily included in
the one charged, or of an attempt to commit the offence so
charged, if such attempt was a separate offence, the law
will support the verdict with every fair intendment, and,
therefore, will by construction supply the words " as charged
in the indictment." The verdict of " guilty " in this case will
be interpreted as referring to the single offence specified in
the indictment. 1 Bishop's Cr. Pro. § 1005 *a*, and authorities
there cited; Wharton's Cr. Pl. & Pr. § 747; *Bond* v. *People*,
39 Illinois, 26. And this principle has been incorporated into
the statute law of some of the States; as in California, whose
Penal Code declares that a general verdict upon a plea of not
guilty, of " guilty," or " not guilty," shall import a conviction
or acquittal of the offence charged in the indictment. § 1151.

What has been said disposes of the objection to the form of

the sentence, which, of course, had reference only to the offence of which the accused was found guilty.

There are other assignments of error, but no one of them requires notice.

Upon a careful examination of the record, we do not find that any error was committed to the prejudice of the accused.

*The judgment is affirmed.*