**UNITED STATES v. MARTINI et al.**
**No. 10701.**

District Court, S. D. Alabama, S. D.
Dec. 27, 1941.

Francis H. Inge, Dist. Atty., and P. C. Fountain, Asst. Dist. Atty., both of Mobile, Ala., for plaintiff.

Homer L. Loomis, of New York City, and William Logan Martin and Martin, Turner & McWhorter, all of Birmingham, Ala., for defendants.

McDUFFIE, District Judge.

The evidence in this case is without substantial conflict. Briefly stated, it is as follows: The master of the Italian steamer Ida Z. O. received orders from the owners prior to the declaration of war that in event of war he was to take refuge in a national port, but in case that was not possible he was to take refuge in a neutral port and to avoid any confiscation of the ship on sea; and that if he could not reach a neutral port or a national port to sink the ship if it was in danger of being captured; and that he was to comply with any order of the Italian government.

On June 6, 1940, four days before Italy declared war against France, the master brought the vessel to the port of Mobile and began loading a cargo of scrap iron. The next day, after taking on board two hundred tons, the loading was discontinued, and on June 27, 1940, the Secretary of the Treasury issued an order under the provisions of Title 50 U.S.C.A. § 191, forbidding the departure of the vessel without the Secretary's approval (Federal Register, July 2, 1940, p. 2442). In October, 1940, the cargo was unloaded and no more tonnage was taken aboard. All the officers and the crew continued to live aboard the vessel.

On November 15, 1940, the vessel was seized on an order of this court on a writ of a foreign attachment by Scott, Bader & Co., the creditors of the vessel, and was in the custody of the marshal of this court when the acts complained of were committed. The master had been placed in charge by the marshal on suggestion of creditors and owners, in order to curtail expense of litigation.

In the latter part of March, 1941, the master of the vessel received an order from the naval attaché of his government to do such damage to the vessel as would prevent her being used in any service that might be helpful to the enemies of Italy.

On March 28, 1941, the master issued an order that the motive power of the vessel be disabled or destroyed, and this order was immediately and thoroughly carried out. He further ordered that the life of the ves-

sel be preserved, that she be kept intact or in good condition in every respect other than the damage to the motive power, and that no injury be done to American property. The evidence showed without conflict that all those participating manually in damaging the engines and boilers of the vessel acted under orders from their superior officers. It was further shown that disobedience of orders might have resulted in court martial proceedings and with the imposition of severe punishment to the extent of imprisonment for life or of the death penalty.

All the fourteen defendants who testified stated they did not intend to injure or endanger the safety of the vessel and that they did not in fact injure or endanger her safety. The master and one or two other officers could speak English but not fluently. The testimony of the members of the crew was given through interpreters. Of the seventeen defendants who gave statements to the government officials investigating the case thirteen said they were ordered to make the ship unfit for sailing or to put it out of commission.

The testimony of the government showed the damage done as set out in the indictment and that as a result of the damage the vessel was helpless to move under her own power and that her safety was impaired in case of a storm or fire; that at sea especially, in case of storm, without her motive power, her safety would be greatly endangered.

The evidence further showed that the ship was securely tied to a pier with ample hawsers, both rope and steel. The harbor of Mobile is thirty miles from the open gulf and naturally is reasonably well protected from violent storms which are infrequent. The ship was moored at the Gulf, Mobile and Ohio Docks within the limits of the City of Mobile. The vessel had a gross tonnage of about 4,900 tons. She was of iron or steel construction. Witnesses varied in their estimates of two to twenty-four hours as necessary to generate steam in her main boilers sufficient for her to move under her own power.

The indictment is drawn under Title III of the Act of Congress of June 15, 1917, 40 Stat. p. 221. This title and section of the act appear now as Section 502, Title 18 U.S.C.A., and read as follows:

"§ 502. Injuring vessels engaged in foreign commerce.

"Whoever shall set fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States as defined in section 501 of this title, or to the cargo of the same, or shall tamper with the motive power or instrumentalities of navigation of such vessel, or shall place bombs or explosives in or upon such vessel, or shall do any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom; or whoever shall attempt or conspire to do any such acts with such intent, shall be fined not more than $10,000, or imprisoned not more than twenty years, or both. The term 'United States,' as used in this section, includes the Canal Zone and all territory and waters, continental or insular, subject to the jurisdiction of the United States. * * *"

The offenses set out in this section are: (1) setting fire to the vessel; (2) setting fire to the cargo; (3) tampering with the motive power or instrumentalities of navigation; (4) placing bombs or other explosives upon the vessel.

The act charged must be done with the *intent to injure or endanger either* (a) the safety of the vessel, or (b) her cargo, or (c) persons on board.

■ It is immaterial whether the injury or danger be intended to take place while the vessel is in a port of the United States or after it has departed therefrom.

After the verdict, a motion for a new trial was duly filed. The motion is based primarily on the ground that (1) the intent alleged was not proven; (2) the acts committed and admitted by defendants do not constitute any of the offenses set out in Section 502.

The question here is whether the court should have directed a verdict of acquittal for the defendants.

Counsel for the government insist that if it be assumed that the evidence did not sustain the charge under Section 502, an assumption with which they do not agree, this motion should be denied because the

defendants are guilty of the offense set out in Section 3 of Title II of the Act of June 15, 1917, Title 50 U.S.C.A. § 193, of the Act of Congress referred to above; that this offense is included in and a part of the greater offense under Title III, Section 502. They cite in support of their contention Section 565, Title 18 U.S.C.A.

Section 3 of Title II, Title 50 U.S.C.A. § 193, as amended March 28, 1940, reads as follows: "§ 193. Destruction of, injury to, or improper use of vessels. It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, willfully to cause or permit the destruction or injury of such vessel or knowingly to permit said vessel to be used as a place of resort for any person conspiring with another or preparing to commit any offense against the United States, or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels to be used in violation of the rights and obligations of the United States under the law of nations; and in case such vessels shall be so used, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws; and whoever violates this section shall be punished by imprisonment for not more than ten years and shall, in the discretion of the court, be fined not more than $10,000. * * *"

The offenses prohibited under this section *are the acts of owner or master or other person in charge or command who* (1) willfully causes or permits the destruction or injury of the vessel, or (2) knowingly permits the vessel to be used as a place of resort, or (3) knowingly permits the vessel to be used in violation of the rights and obligations of the United States under the law of nations.

■ Both sections under consideration are a part of the same Act of Congress of June 15, 1917, 40 Stat. 217, which was offered in the Congress as "A Bill to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes." This act was passed during the first World War and under its provisions, as set out in Title II of the act, Title 50 U.S.C.A. § 193, the Congress provided protection for vessels in American ports as well as incidental protection of the harbors and waterways of the country. Whether or not such vessels were in operation is immaterial. Immediately following this title in the act is Title III, which contains only one section, and as this section appears in the Code the headlines are "Injuring vessels engaged in foreign commerce", which appear also in Title III.

■ ■ A comparison of the two sections can lead only to the conclusion that Congress had in mind a different and separate offense in each section. In Section 193 no intent with which the act is done is suggested nor is it necessary to allege and prove such intent in a prosecution thereunder, while in Section 502 the intent with which the acts are committed is a very material element of the offense and makes it the more serious one of the two offenses. The maximum punishment prescribed in Section 502 as originally enacted was ten times as much as the punishment in Section 193, but by an act approved March 28, 1940, Section 193 was amended and the maximum punishment was increased to ten years.

This court has read with thorough approval the very able reasoning and conclusions of Judge John Paul of the Western District of Virginia in the recent case of United States v. Saglietto et al. The facts in that case were similar if not identical with those in this one, and a motion for a new trial was granted. The views herein expressed are in the main those expressed in United States v. Saglietto et al. found in 41 F.Supp. page 21.

As to the materiality of the intent described in Title III, Judge Paul said: "It should be noted that in addition to the specifically enumerated acts of setting fires, placing explosives, tampering with the motive power, etc., the prohibition of the statute extends to the doing of 'any other act to or upon such vessel'. This expression is plainly meaningless except as accompanied or explained by the intention or purpose with which such 'other act' is done. Congress did not intend that the doing of 'any act' upon the vessel should be a

crime. 'Any act' might be a perfectly harmless one or one having the purpose and result of improving its safety or its ease of navigation. The prohibition is aimed at acts done with a sinister purpose; that is, with the intention of accomplishing the harmful and dangerous results named in the statute. There can be no question of this. And when we consider the language used, 'shall tamper with the motive power * * *, or shall place bombs or explosives * * *, or shall do any other act', it is evident that the intent which must accompany the 'other acts' is likewise applicable to the acts which are specifically enumerated. Neither the 'other acts' nor those enumerated are made unlawful except as done with the intent which the statute sets forth." 41 F.Supp. pages 27, 28.

A review of the background and history of statutes oftentimes is helpful in an effort to determine the intention of the lawmakers, and while it is true the headlines of the codifiers are not always an accurate indication of the contents of a statute, as a general rule they indicate the substance of the statute. A simple reading of the statutes here being compared brings the conviction that the language they contain bears out the headlines.

An examination of the Congressional Record of the 64th Congress, 2nd Session, and of the 65th Congress, 1st Session, is most persuasive that the Congress had in mind a separate and different offense in each of the two sections we are considering.

Titles II and III of the Act of June 15, 1917, had their origin in the prior Congress where they were introduced as separate bills. Title II, now 50 U.S.C.A. §§ 191–193, originated in Senate Bill 6795, entitled "A bill to regulate the conduct of vessels in the ports and waters of the United States in case of actual or threatened war, insurrection, or invasion or threatened disturbance of the international relations of the United States." Cong.Rec. 64th Congress, 2nd Session, Vol. 54, Pt. 3, p. 2820. Title III of the Act of June 15, 1917, originated in Senate Bill 6793, entitled "A bill to prevent and punish willful injury or attempted injury to, or conspiracy to injure, any vessel engaged in foreign commerce, or the cargo or persons on board thereof, by fire, explosion or otherwise." Ib. Pt. 4, p. 3422. These two Senate bills, together with eleven others of the same general purpose of protecting vessels, their cargoes, etc., during the war, were all merged into Senate Bill 8148, which was passed on February 20, 1917, as a substitute for the thirteen separate bills, Ib. Pt. 4, p. 3665. Senate Bill 8148 reached the House and was reported out by the Committee on the Judiciary on February 28 (Ib. Pt. 5, p. 4563), but was not passed during the remainder of that session. During the next session House Bill 291, which became the law, contained in Chapter III the language found in Senate Bill 6793, and which is identical with Title III as enacted except that the maximum penalty was increased upon passage from ten to twenty years. Title II of the act is substantially in the same language found in Senate Bill 6795.

In the debate on Senate Bill 6793 (Title III of the Act of June 15, 1917), the Congressional Record of the 65th Congress, 1st Session, Vol. 55, Part 1, page 793, shows a colloquy on the floor of the Senate which is significant and sheds some light upon the intention of the legislators, and strengthens the contention of the defendants that Congress did not intend to write into the act under consideration two sections which meant the same thing.

"Mr. Thomas. Mr. President, I should like to inquire of the Senator having charge of the bill whether it would not be well to insert another section subjecting all persons who commit any of the acts mentioned in section 1, which result in the loss of human life, to indictment and punishment for murder?

"Mr. Overman. Does the Senator desire to punish by death those guilty under the section?

"Mr. Thomas. It occurred to me that if lives are lost as the result of any of the acts mentioned in section 1 the perpetrators of those acts should be indicted and punished for murder.

"Mr. Overman. I rather think so myself, but the committee thought this was sufficient punishment.

"Mr. King. Mr. President, may I suggest to the Senator from Colorado that the general statute, as I understand, would cover the crime of homicide under such circumstances?

"Mr. Thomas. It is possible that some provision of the Criminal Code would cover just such a case; but if that is so, it is remarkable that it does not also punish the attempt to commit it.

"Mr. King. I think that the Criminal Code covers the case to which the Senator from Colorado refers, and this section is supplemental legislation and directed to another matter which did not heretofore, perhaps, constitute a substantive offense."

Further comparing the two sections, Section 193 is primarily designed to punish the owner or master or other person in charge or in command of any vessel lying in American ports, who causes or permits the destruction or injury of a vessel, while in Section 502 the offense may be committed by any person, the statute beginning with the words "whoever shall, etc."

■ It is not necessary in a charge of tampering "with intent to injure or endanger the safety of the vessel" to prove that there was actual destruction or even a serious injury following the tampering. One might tamper with the machinery without actually destroying or injuring or endangering the whole ship, but if he tampers with intent to do so, he is guilty. Proof of actual injury is not essential, nor is the amount of damage done material.

The offenses in the two sections are similar in that both are designed to protect vessels, yet one provides punishment for injury or destruction exclusively of the vessel, while the other covers not only injury to the vessel, but injury to its cargo and persons on board. One protects any vessel in an American port, whether capable of operation or not, from the acts exclusively of its owner or master or any one else in control of such vessel, while the other provides protection from the acts of any one. Section 502 undoubtedly contemplates vessels capable of being operated or actually being used for carrying cargoes and passengers either within or without American ports.

■ It is true that the word "whoever" as used in Section 502 includes a master, owner, member of crew, or any one else who might be in control of the vessel, yet the fact that the lawmakers used the words "owner or master or any other person in charge or command * * *" in Section 193, is certainly indicative of their intention to protect the vessel against the *acts of one class of offenders in one section, and against another class in the other.*

The acts these defendants are charged with and which they admitted, put the vessel out of commission as a self-propelled instrument of navigation, the type of vessel covered by Section 502.

■ The fact that Congress provided against placing bombs, setting fire to the vessel, or tampering with its machinery with the intent specified in Title III (Section 502) is very persuasive that it contemplated primarily the acts of enemy agents rather than the acts of those whose nation was at peace with this nation and who owned or controlled the vessel. Under Title II (Section 193) no owner, whether friend or enemy, may destroy his ship in an American port. It may be noted that Title III is followed by Title IV of the act, 18 U.S.C.A. § 381, which prescribes punishment of ten years for those who by fire or explosives with intent to prevent, interfere with or obstruct the exportation of articles to foreign countries or who injure or destroy by fire or explosives such articles or the places where they may be while in such foreign commerce. Each title of the act apparently covers a separate offense in carrying out its general purposes.

In a casual reading of the section the words "injure or endanger the safety of the vessel" are rather indefinite as used in Section 502. What is meant by "the safety of the vessel" is somewhat confusing, and this language, as used, can best be understood by a study of the entire act.

The vessel in this case was disabled in that she could not move under her own power, but was her safety injured or endangered? Had she been at sea, with no self-propelling power, her safety might well have been endangered, especially in a storm. Being lashed securely with many cables to a well-constructed pier in the harbor of Mobile, there was no such danger.

■ It was argued that after the damage to her machinery, she could not move in the harbor under her own power in case of fire or storm and her safety was therefore endangered. It is a matter of common knowledge that seagoing vessels lying in port many weeks or months do not keep steam in the main boilers sufficient to move such a vessel. Had it become necessary to move her in case of fire or storm, even with her boilers and machinery intact, a tow boat of the harbor would have been used as is customary in Mobile and other harbors of the country. It usually requires six to twenty hours to raise steam for self-propelling power for such a vessel.

The vessel, after the injury to its machinery, was perfectly safe as a place of abode for the officers and crew, all of whom had lived aboard her for nearly ten months and were living on board after the damage was done and at the time of their arrest.

The auxiliary or donkey engines used to pump water in case of fire on board and to furnish light and water for the crew were left intact. Furthermore, the vessel was safe for the storage of a cargo and might have been safe for use as a seagoing barge to carry cargo. Had the offense charged been committed when the vessel contemplated sailing or while she was preparing to go to sea, then it might have been argued with more reason that the provisions of Section 502 would apply. The evidence, however, is that she was not only under seizure by this court but had been forbidden, by the Secretary of the Treasury of this government, to leave the port of Mobile. These orders alone prevented her sailing and negative the intent alleged in the indictment, and taken with all the other evidence, bear out the testimony of the defendants that their only intention or purpose was to make her unfit for sailing the seas or for use against Italy, and not to injure or to endanger her safety.

It appears to this court that it would be unreasonable to believe the "tampering" or injury to the machinery was done with an intent to injure persons on board because the only persons on board were those who wrecked the machinery. We cannot believe they intended to injure themselves. They could not have intended to injure a cargo because the vessel had unloaded and had no cargo on board. The undisputed evidence is to the effect that they were ordered not to set fire to the ship nor to damage it in any way except to damage or destroy its motive power and that no other injury or damage was done by the defendants.

In using the language "to injure or endanger the safety of the vessel", therefore, as charged in the indictment, Congress did not contemplate an injury by its owners that might result merely in making it unable to move under its own power, but an injury done by others with intent to endanger its entire safety or to encompass its destruction as a whole or as a unit of navigation, when it was being used or was capable of being used at the time of the commission of the offense, for the transportation of men and goods to foreign countries.

Since the beginning of warfare between nations, they have found it advantageous at times to destroy their own property to avoid its being used by the enemy or his agencies. One may destroy his own property whenever he pleases, provided, in doing so, he does not injure his neighbors nor violate some statute forbidding its destruction. Section 193, prohibiting injury or destruction of a vessel in an American port, by its owner or master or other person in charge or command, regardless of any intent involved in causing such injury or destruction, is based on sound reasoning. In a port the sinking of a vessel may block the passage in and out of the harbor with inconvenience to the commerce of the nation and with damage to the safety of the port when our nation is either at peace or at war with other nations. To set fire to one's own vessel might cause the burning of other vessels and of wharves, and even of a port city; furthermore, the willful destruction of a vessel might deprive the government of its use in case of emergency, or it might affect the neutrality of the nation. Such a crime, however, is far removed from the crime of setting fire to the vessel or to the cargo or of placing bombs upon the vessel, or tampering with the motive power or instrumentalities of navigation of a vessel, with intent to take the lives of those on board or to destroy the cargo of the vessel, or to injure the safety of the vessel as this court believes that term is used in the statute.

Had Congress prohibited in Title III a tampering with the machinery of a vessel with intent to injure its motive power, or to impede its use, there would likely have been no issue here. But such an offense was not contemplated by those who were endeavoring by this title to provide for the safety of human life and the protection of tonnage needed in the prosecution of a war. Simply stated, Section 3 of Title II (Section 193) protects property, the nation's neutrality and the waters of our ports; the other Title (III, Section 502) is designed to protect human life and cargoes, as well as to preserve intact the vessel actually engaged or capable of being used in transporting men and material on the high seas in times of war.

At the time the offense charged in this case was committed, the United States was

a neutral nation and at peace with all nations, and this fact itself, makes it difficult to believe, or extremely doubtful, except by one wholly uninformed or hysterical, that the nationals of Italy who, in this instance, injured the motive power of their own vessel, were acting with hostility or enmity to this nation and with the intent which must be shown in order to prove their guilt as charged.

■ The court charged the jury in this case that damage to the motive power alone was not sufficient to prove the crime charged in the indictment, unless the damage was done with the intent to injure or endanger the safety of the vessel as a whole as a cargo carrying unit. The jury, however, with little hesitancy, returned a verdict of guilty as charged in the indictment. The jury was also instructed that there was no evidence of conspiracy as charged and that no verdict of guilty could be found on the conspiracy count of the indictment. This court, after a further and more thorough consideration, feels it should have instructed the jury to find the defendants not guilty as charged.

Juries are sometimes unwittingly affected by a sentiment or a prejudice. For this reason in criminal cases a change of venue, in our concept of justice, is provided. But if our American ideals of justice are to endure, courts must continue to be, as they have been, free from any prejudice or passion which sometimes sweeps over communities, states and nations.

As stated above, counsel for the government contend that under 18 U.S.C.A. § 565, the motion here should be denied. That section reads as follows: "§ 565. Verdicts; less offense than charged. In all criminal causes the defendant may be found guilty of any offense the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offense so charged, if such attempt be itself a separate offense.* * *"

There was no count in the indictment charging a violation of Section 193, nor was there a suggestion or reference from either side or by the court to such an offense. The government chose to proceed under Section 502, the greater and more serious offense, and presented its whole case thereon. The defendants, of course, made no attempt to defend themselves against the crime set out in Section 193. They admitted doing

the damage on the orders of their captain who assumed full responsibility for their acts, and who also admitted that he knew that to injure the vessel was against the law, but that he acted on orders from his government issued through the naval attaché at Washington, D. C.

■ While the officers and crew of the ship were subject to the orders of their own government, they must accept the consequences of violating American laws. This is one of the hazards of war they assumed. However, considering that a refusal to obey orders might have brought upon themselves severe punishment, there is additional reason for serious doubt that they acted with that intent charged in the indictment. This does not mean that they may not be guilty of violating Section 193.

■ Section 565 authorizing the verdict of guilty of a lesser offense contemplates that the verdict must be by the finder of fact to which the question of guilt is submitted. This means in this case the jury. Where the jury finds a defendant guilty of one offense it is not within the power of the court after setting aside the verdict to find the defendant guilty of a lesser offense. The statute is no doubt intended to cover offenses such as are included in the charge of murder, which embraces the lesser offenses of manslaughter—Sparf and Hansen v. United States, 156 U.S. 51, 63, 64, 15 S.Ct. 273, 39 L.Ed. 343, 347; Stevenson v. United States, 162 U.S. 313, 315, 16 S.Ct. 839, 40 L.Ed. 980, 981; Ball v. United States, 163 U.S. 662, 670, 16 S.Ct. 1192, 41 L.Ed. 300, 303; or of burglary and felonious breaking which includes larceny—United States v. Dixon, Fed.Cas. No. 14968; United States v. Read, Fed.Cas.No. 16,126. If the defendants had been charged with a violation of Section 193 they would have had an opportunity to introduce evidence which was not pertinent to the charge under Section 502. There is testimony in the record which was irrelevant under Section 193 but as to which the defendants raised no objection on the trial because they were being prosecuted under Section 502 as to which such testimony was relevant.

■ A finding of "guilty as charged in the indictment in this case" must be taken as a finding of guilt under Section 502 which was the specific offense charged. The language of the Supreme Court in St. Clair v. United States, 154 U.S. 134, 154,

14 S.Ct. 1002, 38 L.Ed. 936, 943, 944, would seem to preclude any right on the part of this court to assume that the jury in this case found the defendants guilty under Section 193, or that it found them guilty of any other offense than the one with which they were specifically charged.

The case of United States v. Hansee, C. C., 79 F. 303, was cited by government counsel in support of the application of Section 565. The question in that case was an attack on the indictment on the ground that it was broad enough to cover two separate offenses. The court held properly that this did not invalidate the indictment and pointed out that if the evidence did not support proof of the larger offense specifically named in the indictment, there could nevertheless be a conviction for a lesser offense covered by another statute, which was necessarily included in the former. This question arose on the validity of the indictment and not after a trial on which a conviction for the more serious offense had been obtained. The case is not applicable here.

■■■ It should be noted that the acts of the master of the vessel, Captain Martini, while he was an officer of this court, having been placed in charge of the vessel by the marshal, clearly place him in contempt of the court. This question, however, has not thus far been presented.

Being of the opinion that the evidence in this case was insufficient to justify a verdict of guilty as charged in the indictment, the verdict should be set aside and a new trial granted. Such an order has been entered.