## UNITED STATES v. CAMEAN.

No. 200, Docket 21259.

United States Court of Appeals Second Circuit.

May 5, 1949.

Haskell R. Barst, of New York City, for petitioner-appellee.

John F. X. McGohey, U. S. Atty., of New York City (John F. Ryan and Alvin Lieberman, Atty., Immigration & Naturalization Service Dept. of Justice, both of New York City, of counsel), for respondent-appellant.

Before L. HAND, Chief Judge, and CHASE and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The United States appeals from an order admitting to citizenship the petitioner, Camean, under that section of the Nationality Act of 1940,[1] which provides that in place of continuous residence an alien may substitute the period of any service "on board vessels of more than twenty tons burden, whether or not documented under the laws of the United States, and whether public or private, which are not foreign vessels, and whose home port is in the United States." The petitioner is a seaman who for twenty-one months of the five years preceding the filing of his petition served on ships which concededly satisfied the language just quoted; but who for the rest of the period was on ships that were registered in the Republic of Panama, flew the flag of that state, and were owned by corporations organized under its laws. On the other hand, all the shares of these corporations were owned by corporations organized under the laws of states of the United States, their crews were signed on and discharged in the United States, and they plied between the United States and foreign ports. The question is whether these ships were "foreign vessels" within the meaning of the section just cited.

The present exception in the Nationality Act in favor of seamen had its origin in 1918 in an amendment to subdivision seventh of § 4 of the Act of June 29, 1906,[2] which added the clause: "on board of merchant or fishing vessels of the United States of more than twenty tons burden." The phrase, "vessels of the United States," there used, meant either registered, enrolled, or licensed, for so it had already been defined.[3] In 1929 the clause so added in 1918 was amended to read: "on board vessels of more than twenty tons burden, whether or not documented under the laws of the United States, and whether public or private, which are not foreign vessels"; and so it has remained, except for the addition in 1940 of the clause: "and whose home port is in the United States." Concededly, in this final form the language covers vessels, not "documented," which are owned by American citizens, including American corporations; and thus the issue is narrowed to whether it is limited to those whose title is so held, or whether it also includes those which are owned through the means of a wholly owned foreign corporation. Since we have to deal with a term which is not a word of art, and was apparently used in its colloquial sense, it is especially proper to look to the purposes of the statute as a whole. These were apparently two, one of which was to allow a class of persons to become citizens, whose occupation prevents them from complying with the condition imposed upon aliens in general: continuous residence in the United States.[4] That condition is imposed because residence is regarded as a proving ground on which the alien's qualifications can be tried; and these are "good moral character" and attachment "to the principles of the Constitution."[5] Already in 1918 it was apparently recognized that service on shipboard would afford an equivalent opportunity for acquaintance with the alien, provided he served on "documented" vessels, since he would be in one of the most intimate of occupational associations, a seaman among his shipmates. When the original was expanded to include ships, not "documented," it became important to provide substantially as good a test of these qualifications as before, and this was as-

---

[1] Section 725(a), Title 8 U.S.C.A.

[2] 40 St. at L. 542.

[3] 29 St. at L. p. 188, 46 U.S.C.A. § 221.

[4] § 707(a), Title 8 U.S.C.A.

[5] § 709(a), Title 8 U.S.C.A.

sured by making it a condition that the ship should not be "foreign"; and this was carried still further in 1940 by requiring her "home port" to be in the United States, where her crews would presumably be recruited. In realizing this object it is not important whether an American corporation holds the legal title to the ship, or is the only shareholder of a foreign corporation—at least not when her "home port" is in the United States. All that is important is that the alien's service shall expose him to a scrutiny which is the measurable equivalent of actual residence; and as to that the holder of her legal title is not relevant. Nor has that circumstance any greater relevance to the other purpose of Congress, which presumably was to secure citizen seamen to man our merchant marine in such numbers as the law required.[6]

These considerations seem to us persuasive for not interpreting the phrase, "foreign vessels," to cover such ships as those here involved; and we find some confirmation of this in the use of the phrase, "American owned," in an earlier section of the same Act,[7] which almost certainly has the same content as "not foreign vessels" in the section at bar. Certainly it would be extreme literalism to hold that the ships here in question were not "American owned." On the other hand, we must concede that it would not conflict with the text to read "foreign vessels" as including all those whose title is vested in foreign owners. Even a seagoing "undocumented" vessel may be owned and legally operated by American citizens, although she is not a "vessel of the United States,"[8] and does not enjoy the privileges of such vessels.[9] Nevertheless, it seems to us improbable that such ships should be the only ships engaged in foreign trade which the section covers as "undocumented." Yet that would be the result, for a "documented" ship includes a "registered" ship, and a "registered" ship must be engaged in foreign trade. We can scarcely believe that, handicapped in that trade as such ships would be, they could be of enough practical importance to deserve the attention of Congress. For the foregoing reasons we hold that the word, "foreign," does not confine ships engaged in foreign trade to the unprivileged class we have just described, and we hold that § 725(a)(2) covers the ships here at issue.

In what we have said, and in what we are deciding, we have assumed that the "home ports" of all the ships at bar were in the United States. For this we have relied upon the statement in the record that the crews were all signed on and discharged in a port of the United States, and upon the fact that the appellant has not raised the question, although the Immigration and Naturalization Service did raise it in the district court. However, not only is the record itself without specific proof that the "home ports" of all the ships involved were within the United States, but some of the certificates of the shareholding companies submitted as evidence affirmatively declare that the "home ports" were outside the country. Our decision must therefore be understood to be subject to revision if the appellant wishes to raise this issue. Nevertheless, as the case comes to us, the order will be affirmed.

Order affirmed.

---

[6] § 672a(a) and § 1132(a), Title 46 U.S.C.A.

[7] § 707(d)(2), Title 8 U.S.C.A.

[8] § 221, Title 46 U.S.C.A.

[9] The Mohawk, 3 Wall. 566, 571, 18 L. Ed. 67; Badger v. Gutierez, 111 U.S. 734, 737, 4 S.Ct. 563, 28 L.Ed. 581; St. Clair v. United States, 154 U.S. 134, 151, 14 S.Ct. 1002, 38 L.Ed. 936; Braga v. Braga, 314 Mass. 666, 669, 51 N.E.2d 429.