Charles Edward Anderson BERRY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 16752.

United States Court of Appeals Eighth Circuit.

Oct. 27, 1961.

Certiorari Denied Jan. 8, 1962.

See 82 S.Ct. 398.

Merle L. Silverstein, St. Louis, Mo., for appellant. Rosenblum & Goldenhersh, St. Louis, Mo., on the brief.

Frederick H. Mayer, Asst. U. S. Atty., St. Louis, Mo., for appellee. D. Jeff Lance, U. S. Atty., St. Louis, Mo., on the brief.

Before SANBORN, MATTHES and RIDGE, Circuit Judges.

SANBORN, Circuit Judge.

This is the second appearance of Charles Edward Anderson Berry as an appellant in this Court. He was, on December 23, 1959, charged by indictment with having knowingly transported in interstate commerce from El Paso, Texas, to St. Louis, Missouri, a girl known as Janice Norine Escalanti, with intent to induce her to engage in immoral practices, a violation of 18 U.S.C. § 2421. Berry entered a plea of not guilty, was tried to a jury, found guilty, and on March 11, 1960, sentenced to five years imprisonment and to pay a fine of $5,000. He appealed from that judgment, asserting that the evidence was insufficient to establish the intent necessary to make his admitted transportation of the girl a criminal offense. He also contended that he did not have a fair trial because of

prejudicial remarks and conduct of the trial judge, and that the court erred in its instructions to the jury. This Court held that, under the evidence, the question of Berry's intent was one of fact for the jury, and that the instructions of the trial court as a whole were "adequate, fair and accurate." We held, however, that the attitude of the judge, as evidenced by some of his remarks during the trial, made the trial unfair. We vacated the judgment appealed from, and remanded the case for a new trial. Berry v. United States, 8 Cir., 283 F.2d 465.

The case has now been retried before a different jury and a different judge. The instructions given the jury were the same as those we held to be adequate, fair and accurate on Berry's original appeal. The jury returned a verdict of guilty, and from a sentence of imprisonment for a period of three years and a fine of $5,000, Berry has appealed. He does not challenge the sufficiency of the evidence. He challenges the validity of one of the court's instructions, which it is asserted would have permitted the jury to convict him if they found that he had committed a "sexual act" with the girl not amounting to debauchery or an immoral practice. Considering the court's instructions as a whole, we are still of the opinion that they were adequate, fair and accurate. We shall say no more about that question.

The only other error that is asserted is the refusal of the trial court to make a private inspection of the grand jury testimony of Janice Escalanti, the chief government witness, to discover whether there were inconsistencies between that testimony and her testimony at the trial which should be made available to defendant's counsel for purposes of impeachment.

The controverted issue in this case was a simple one: Did Berry transport the girl for the purpose of having sexual intercourse with her, as the Government's evidence indicated, or did he transport her in order to furnish her legitimate employment at his night club in St. Louis as a hat check girl, as he testified?

The facts which gave rise to the charge against Berry are, in large part, undisputed. Berry was a musician, singer and entertainer. He and his band, consisting of three musicians, were on an entertainment tour, traveling in his Cadillac automobile from one engagement to another. One of the places at which they performed was El Paso, Texas, on December 1, 1959. There Berry met Janice Norine Escalanti, a fourteen-year-old Apache Indian girl, with an eighth grade education. She worked in El Paso as a waitress and engaged in prostitution. Berry offered her a job as a hat check girl in his night club in St. Louis. She sold photographs for him during his performance in El Paso. She accepted his offer of employment and his invitation to join him for the remainder of the tour and to sell photographs at his performances. After the engagement at El Paso on December 1, 1959, Berry, his band and the girl left for Tucson, Arizona, where they arrived in the daytime of December 2. There he procured two adjoining rooms at a motel —one for the band and the other for himself and the girl. Each room contained two double beds. The girl and Berry occupied the same room while in Tucson. The band had the adjoining room. She sold pictures at the performance there on the evening of December 2. From Tucson the party drove to Phoenix, Arizona, for a performance, and thence to Santa Fe, New Mexico, for another. From Santa Fe they drove to Denver, Colorado. Berry registered on December 5, 1959, at the Drexel Hotel for the room he and the girl were to occupy, as "Mr. and Mrs. Janet Johnson." That room had one bed. The room was occupied by Berry and the girl while they were in Denver. From Denver the group drove to Pueblo, Colorado, for another performance. After that performance, they drove to Kansas City, Missouri, where Berry took a plane to St. Louis. The girl and the band arrived

at St. Louis by the automobile that same evening. When they reached St. Louis, the girl was driven to Berry's house. She was taken by him to the night club and introduced to Francine Gillium, the manager of the club, at whose home the girl was to stay. On or about December 18, Berry told the girl she would have to leave because her work was unsatisfactory. At his direction, she packed up her clothes in a plain paper bag. Berry drove her to the bus station, bought her a ticket to El Paso, Texas, and gave her $5. She had told him that she wanted to go to Yuma. Berry did not remain at the station with her until her bus arrived. While waiting for the bus after he left her, she changed her mind about leaving St. Louis. She visited the night club that evening. Berry took the bus ticket from her purse. On December 22, she called the police at Yuma, Arizona. She had no means for going to El Paso or Yuma. She was told by the Yuma police to stay and wait for the St. Louis police to come for her. The St. Louis police arrested her and Berry, and took them to the police station.

The girl testified at the trial that during the trip from El Paso to St. Louis, she and Berry had sexual intercourse a number of times; that they slept in the same bed in their motel room in Tucson; that on their journey from Tucson, Arizona, to Denver, Colorado, Berry had intercourse with her on two occasions in the back seat of the automobile; that at the Drexel Hotel in Denver, where she and Berry occupied the same room, with the one bed, he had intercourse with her; and that while she was living at the home of Francine Gillium in St. Louis, Berry had intercourse with her frequently.

While Berry admitted having transported the girl on his tour from El Paso, having occupied the same room with her in Tucson and in Denver, having arranged to have her stay with Francine Gillium in St. Louis, and having called at the Gillium home on occasions, he denied having had sexual intercourse with Janice Escalanti at any time.

At the trial, Berry, who testified in his own behalf, was asked, "What was your purpose in bringing Janice from Texas to Missouri?" His answer was, "She needed a job and I had a job for her in the club."

At the conclusion of the direct examination of Janice Escalanti, counsel for Berry requested that the Government furnish the defense, for purposes of impeachment, all statements made by her to Government officers, and also requested that the Government present to the court, for its private examination, the minutes and the record of her testimony before the grand jury, so that the court could ascertain whether they contained impeaching or contradictory matter. The trial court sustained the motion for the production by the Government of the statements requested, but refused to examine the grand jury minutes or record of the testimony of Janice Escalanti, to search for matter to be used for impeachment of her trial testimony.

To support the contention that the refusal by the court to make a private examination of the grand jury testimony of Janice Escalanti was reversible error, counsel for Berry rely mainly upon the decisions of the Court of Appeals for the Second Circuit. United States v. Spangelet, 2 Cir., 258 F.2d 338; United States v. Hernandez, 2 Cir., 282 F.2d 71; and United States v. Hernandez, 2 Cir., 290 F.2d 86.

In United States v. Procter & Gamble Co., 356 U.S. 677, 681, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077, the Supreme Court, referring to the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts," said:

"* * * This 'indispensable secrecy of grand jury proceedings,' United States v. Johnson, supra, 319 U.S. 503, at 513, [63 S.Ct. 1233, 87 L.Ed. 1546], must not be broken except where there is a compelling necessity. There are instances when that need will outweigh the countervailing policy. But they must be shown with particularity."

In Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400–401, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323, the Supreme Court said:

"* * * This Court has long held that there are occasions, see United States v. Procter & Gamble, supra, [356 U.S. 677], at 683, [78 S.Ct. 983, 2 L.Ed.2d 1077], when the trial judge may in the exercise of his discretion order the minutes of a grand jury witness produced for use on his cross-examination at trial. Certainly 'disclosure is wholly proper where the ends of justice require it.' United States v. Socony-Vacuum Oil Co., supra [310 U.S. 150], at 234 [60 S.Ct. 811, 84 L.Ed. 1129].

"The burden, however, is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy. We have no such showing here. As we read the record the petitioners failed to show any need whatever for the testimony of the witness Jonas. They contended only that they had a 'right' to the transcript because it dealt with subject matter generally covered at the trial. Petitioners indicate that the trial judge required a showing of contradiction between Jonas' trial and grand jury testimony. Such a preliminary showing would not, of course, be necessary. While in a colloquy with counsel the judge did refer to such a requirement, we read his denial as being based on the breadth of petitioners' claim. Petitioners also claim error because the trial judge failed to examine the transcript himself for any inconsistencies. But we need not consider that problem because petitioners made no such request of the trial judge. The Court of Appeals apparently was of the view that even if the trial judge had been requested to examine the transcript he would not have been absolutely required to do so. It is contended here that the Court of Appeals for the Second Circuit has reached a contrary conclusion. United States v. Spangelet, 258 F.2d 338. Be that as it may, resolution of that question must await a case where the issue is presented by the record. The short of it is that in the present case the petitioners did not invoke the discretion of the trial judge, but asserted a supposed absolute right, a right which we hold they did not have. * * * *"

In the opinion of the Court of Appeals for the Fourth Circuit in the case of Pittsburgh Plate Glass Company v. United States, 260 F.2d 397 (affirmed by the Supreme Court), the obvious drawbacks of compelling trial judges to inspect the grand jury minutes of the testimony of a witness, in an attempt to ferret out possible inconsistencies, are accurately pointed out. See, also, and compare, Travis v. United States, 10 Cir., 269 F.2d 928, 945; Herzog v. United States, 9 Cir., 226 F.2d 561, 567.

■ In the instant case, it is inconceivable to us that there was any reason why the trial judge, in the interests of justice, shall be compelled to examine the transcript of the testimony of Janice Escalanti before the grand jury. The defense had the statements she had given to the Federal Bureau of Investigation and to the St. Louis police. She was cross-examined at the trial in minute detail as to material, as well as inconsequential, matters about which she testified. As we have said, there was no dispute as to Berry having transported her. The only controverted question was whether he had had immoral relations with her on the trip from El Paso to St. Louis and after reaching St. Louis, as she testified at the trial. There was no reason whatever to suspect that her grand jury testimony had differed in any material respect from that which she gave at the trial with regard to Berry's relations with her. There was no compelling necessity for the examination by the court, privately or otherwise, of her testimony before the grand jury.

**196**

Obviously, no indictment would have been returned unless she had testified before the grand jury that she had had immoral sexual relations with Berry. We are convinced that the trial judge did not abuse his discretion in refusing to examine her grand jury testimony in a hunt for possible inconsistencies. His refusal, in our opinion, was neither erroneous, prejudicial nor an abuse of his discretion.

The judgment appealed from is affirmed.