**UNITED STATES of America**

v.

**Louis BERTUCCI, also known as "Toots", Glenn Doherty, Morris Abrams, William McCabe, also known as William G. Smith, and John Zoroiwchak, also known as John Zuroick, Appellants in Nos. 14351, 14345, 14352, 14353, 14354, respectively.**

**Nos. 14345, 14351–14354.**

United States Court of Appeals
Third Circuit.

Argued March 17, 1964.

Decided June 16, 1964.

Certiorari Denied Oct. 12, 1964.
See 85 S.Ct. 75.

Raymond W. Bergan, Washington, D. C. (Edward Davis, Philadelphia, Pa., Williams & Stein, Washington, D. C., on the brief), for appellants.

Harry T. Alexander, Dept. of Justice, Crim. Div., Washington, D. C. (Drew J. T. O'Keefe, U. S. Atty., Edmund E. De-Paul, Asst. U. S. Atty., Philadelphia, Pa., Shellie F. Bowers, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before McLAUGHLIN, GANEY. and SMITH, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellants, with Jerry Barsuglia, were indicted and tried for conspiracy to commit offenses in violation of Sections 101 (a) (1), 101(a) (2), 101(a) (5) and 610 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. §§ 411(a) (1), 411(a) (2), 411(a) (5) and 530 and of sixteen related substantive offenses in violation of Section 530.[1]

---

1. "§ 411. Bill of rights; constitution and bylaws of labor organizations

"(a) (1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

"(2) Freedom of speech and assembly. —Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to

Rita Mancini was named in the indictment as an unindicted co-conspirator. At the conclusion of the trial, on motion of the Government, the indictment against Barsuglia was dismissed. All of the appellants were found guilty on Count One, the conspiracy count. On the substantive counts Bertucci was found guilty on Counts Two and Six, involving Flounders and Axler; not guilty on Counts Seven and Eight, involving Mrs. McKay and Mrs. Corr. Doherty was found guilty on Counts Twelve, involving Graffigna; not guilty on Counts Eleven and Thirteen, involving Campbell and Kropp. Abrams guilty on Count Three, involving Flounders. McCabe guilty on Counts Four, Fourteen, Fifteen and Sixteen, involving Flounders, Kay, Corr, Campbell and Quirk. Zoroiwchak guilty on Count Five, involving Flounders. The offenses of which appellants were convicted involved infringement of the civil rights of the persons noted under Sections 101(a) (1), 101(a) (2) and 101(a) (5) of the said Act and in violation of Section 610 thereof in that they conspired to and did prevent by the use of force and violence those persons from exercising their right to attend and participate in a membership meeting of Transportation, Checkers, Receivers and Clerical Workers Union, Local 161, on February 22, 1962 at 105 Spring Garden Street, Philadelphia, Pennsylvania, and to express their views, etc. upon matters properly before the meeting and of conspiring to so prevent them.

Local 161, consisting principally of employees of the Philadelphia Transportation Company (PTC), was organized in 1955 and is affiliated with the Teamsters Union. It has always been tightly controlled by Lawrence J. Mullen as Business Manager and Secretary-Treasurer. Until 1960, he and the Executive Board appointed the Local's officers and trustees. In 1960 there was an election of officers at which Mullen and his group were unopposed. Mullen alone has always possessed the power to name the union's shop stewards. Sometime prior to August 1961 some of the members, including a majority of those whose rights were found to have been infringed by appellants, sought to obtain changes in the union which would give the membership generally a voice in its affairs. Those efforts were unsuccessful in August and September of that year. In October they helped in inducing Mullen to call the first meeting of the membership to be held in a year. The proposal to have the stewards elected rather than appointed got nowhere at that meeting. The President of the Local as chairman and Mullen who took over as chairman, refused to listen to it; the latter peremptorily adjourned the meeting. The minority, by then called Sweep, went into the district court seeking protection of the members' rights, inter alia, that regular meetings be held and that the court designate a meeting at which the supposedly proposed PTC contract could be passed upon. Prior to any action by the court, Mullen negotiated a collective bargaining agreement with PTC on January 23, 1962 which the latter considered "a bona fide contract. * * * As of February 1st." Mullen then sent out a letter calling for a vote by mail on a proposed collective bargaining agreement with PTC with the ballots to be counted February 2, 1962. The letter fixed February 22, 1962

impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

  *       *       *       *       *

  "§ 530.  Deprivation of rights by violence; penalty

  "It shall be unlawful for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter. Any person who willfully violates this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both."

for a membership meeting; it stated "All explanations concerning the procedures will be made. All questions will be answered." The district court on February 1, 1962, by agreement of the parties, fixed general membership meetings to be held February 22 and 24, 1962 with ballots cast by mail to be received not later than February 28, 1962.

All of the above brings us to the meeting of February 22, 1962. The five appellants were present in and about the meeting hall. Bertucci and Doherty were employees of the Local. Six days before the meeting Bertucci's salary had been raised from $95 a week to $140 and Doherty's from $60 to $100 a week. McCabe, Abrams and Zoroiwchak were shown to be members of the Teamsters Local 107, the first two were salaried employees of same at $150 per week apiece.

There was trial testimony by Edmund Flounders, a member of the Local and of Sweep, that on February 22, 1962, the date of the meeting his dues were paid up and that he sought admission to the meeting from appellant Bertucci who was at a table just inside the entrance door of the hall. He said that he showed his union card to Bertucci " * * * and he [Bertucci] said 'Uh-uh' ". As the witness admitted later, Bertucci would not allow him to enter the hall. The witness stated that he said, "I don't understand why * * *", continuing, he testified that " * * * I don't know whether I was shoved into Toots [Bertucci] or whether I took the first punch at Toots or not but a melee followed." At that point the Government pleaded surprise to the testimony "because it is at variance with prior statements given to the Government by the witness." The motion to cross-examine Flounders was granted. The witness was asked, " * * * did you ever mention taking the first punch to Mr. Mahlon Price of the F.B.I.?" A. "No, I did not." Q. "Did you ever mention it at any time during the testimony under oath before Judge Luongo?" A. "I don't remember." The witness was shown his testimony before Judge Luongo where he had testified that Bertucci

had said to him, "Look, God damn it, if you are looking for trouble you are going to get it." Regarding this he stated "If it is in the record I did." He was also shown the Grand Jury notes where he had made the same statement and said, "I said that." He testified that he was knocked down and slugged, that "somebody hit me with a pipe on this shoulder and somebody hit me with a baseball bat over here * * * I was unconscious". He identified appellants McCabe and Abrams as two of the men who hit him. There was testimony by Andrew J. Quirk that Bertucci, McCabe and another had refused Flounders admission; that Flounders came out of the door backwards; that a punch missed him and hit someone else; that Flounders started to run towards the street and that McCabe "a big man in a sweater was chasing him"; that McCabe hit Flounders and knocked him down; that Flounders was picked up, his nose and mouth all bloody, put into a car and taken to the hospital. Mr. Quirk said he did not see Flounders punch anyone at the door. Daniel W. Haag testified he saw Flounders while the latter was trying to obtain admission. He thought he was talking to Barsuglia, " * * * after that I heard the commotion and I saw him coming back toward me." He did not see Flounders do anything. Mrs. McKay testified that prior to the meeting Bertucci was behind a desk and gave Mrs. McKay and the people with her, including Mrs. Corr, attendance slips to fill in with names, addresses and telephone numbers; that Doherty and another man later advised them that they had to go " * * * he had orders * * * they had to leave"; that McCabe came up to them and told a Mr. Campbell who was in the group that it was none of his business [why Mrs. McKay and Mrs. Corr had to leave] and for Campbell to mind his business "or he'd leave too". Mrs. McKay said she left because she "was afraid to stay longer". Mrs. Corr, as a witness, told how Rita Mancini a member of the Local who sits with the Board had pointed out Mrs. McKay and herself to appellants Doherty

and McCabe who advised those people they had to leave the hall. Mrs. Corr left because she was afraid. Mr. Campbell corroborated the two women to a large extent. He was stopped by Doherty who told him he would have to leave because he had been expelled or suspended. He heard Doherty say the same thing to Mrs. McKay and Mrs. Corr.

Nathan Axler, a Local member, on the day and time of the February 22nd meeting observed the hall entrance blocked by Bertucci, Barsuglia and Rita Mancini seated at a table. He saw and heard Bertucci holler at him, Messrs. Donnelly and Braubitz that they had been suspended and weren't allowed to attend the meeting. He saw Haag whom he had brought to the hall "reeling back holding his mouth * * * he was bleeding from the mouth * * * he has a heart condition, * * I grabbed him, pushed him against the wall of the building and stood over him to prevent him being hit again." He said "Mr. Barsuglia said to me that I ought to leave before somebody got hurt and Mr. Bertucci was hollering at me and he said, 'I'll get you, you s.o.b. * * *' He used the full words." He saw Flounders "on the ground, bleeding from the face and head. He was being helped to his feet by Mr. Donnelly and somebody else, I don't remember who."

Donnelly, a Local member, on the 22nd went to the hall doorway where Bertucci was standing. The latter told him, "You are not allowed in * * * you were expelled." Donnelly told Bertucci he had not been expelled. Bertucci replied, "Well, you were told you are not getting in." Donnelly saw Flounders come out of the hall backwards with his hands extended over his head. He saw men following Flounders " * * * and Flounders went down against this parked car. * * * A member of the Labor Squad came down and this one fellow was leaning over a car like hitting—to hit Flounders * * * The officer pushed this man back. He said, 'That's enough, Bill.' " There was most substantial further testimony by witnesses Martone, Coughlin, Kropp, Maier, Braubitz along

the same general lines. Police Officer Gordon said that he and other officers were patrolling the meeting area. Some 15–20 feet from the entrance door they saw Abrams, McCabe, Zoroiwchak and Joseph McCreel standing on the northeast corner of Hope and Spring Garden Streets in a group of fifteen to twenty men "what we thought were Teamster members * * *." A group of about six to eight men came over to them and said they had been denied admission to the hall. The officer believed they had told him they were Local 161 members. Then the officers "heard some type of noise * * * somebody yelling or shouting, or whatever it was that caused us to look around." The location of the noise was closer to the other entrance to the hall. They then saw "a group of people all running, or some of them walking, a lot of them running towards the scene or the point of attention. * * * Some of the people running were the same people I had seen on the corner. * * * William McCabe, Morris Abrams, John Zoroiwchak and others * * * I believe I saw Louis Bertucci." Gordon went to the scene, saw a man lying on the ground. He observed McCabe and Abrams close to him and pushed them back. After that Gordon requested radio help and "probably at least six to eight police vehicles of various types" responded. Gordon and his partner saw a group of Teamsters including McCabe, Abrams and Zoroiwchak walking toward Second and Spring Garden and ordered them to walk back towards Hope Street and Spring Garden. Gordon put in another call for assistance. The group of Teamsters reached their parking lot at Hope and Spring Garden. " * * * they all hollered nobody can go on their parking lot because it was theirs." The police ordered the Teamsters group from the parking lot and they went into the union hall. Gordon recalled that just about 8:00 P.M. the evening of the meeting of February 22nd, he saw Bertucci in the doorway of the union auditorium.

Appellants' main point, argued at considerable length, is that the district court

erred in refusing to review the Grand Jury testimony of Government witnesses and to make such testimony available if inconsistencies appeared. It will be remembered that the Government pleaded surprise to the trial evidence of the witness Flounders as inconsistent with his statements to the Grand Jury. All of Flounders Grand Jury testimony was at that time given the defense. What the defense then did was make a motion for the trial court " * * * to examine in camera the Grand Jury testimony of all persons who testified for the Government and if inconsistencies are found to turn them over to the defense to utilize in cross-examination." The trial judge ruled the all inclusive request was improper and denied it. He expressly stated that, as with the Flounders' testimony, he would have turned over to the defense the Grand Jury testimony of any other trial witness where the Government pleaded surprise.

Appellants cite United States v. Giampa, 290 F.2d 83, 85 (2 Cir.1961) as the legal basis for their request. With all respect, we think that decision misconceives the problem and fails in its attempted resolution thereof. The Supreme Court in this kind of a situation tells us in unmistakable language that "The burden * * * is on the defense to show that 'a particularized need' exists for the minutes which outweighs the policy of secrecy." Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 403–404, 79 S.Ct. 1237, 1241, 3 L. Ed.2d 1323 (1959). This court in United States v. Boyance, et als, 329 F.2d 372 (1964) faced the exact question which here confronts us and in an opinion by Judge Staley, held:

> "We think that the rule of the Second Circuit as expressed in United States v. Giampa, supra, equates the right of the defense to an examination of Grand Jury testimony to the right to the production of a Jencks Act statement. The only distinction is that the trial judge must first examine the Grand Jury transcript. But the Supreme Court has

expressly held that the rationale of Jencks is not to be applied to Grand Jury testimony, and that the defendant has the burden of establishing a particularized need for such testimony. Pittsburgh Plate Glass Co. v. United States, supra. The question then is whether such a need has been shown in the case at bar."

■■ As we have seen, the need for supplying the defense with Flounders' Grand Jury testimony was immediately recognized and taken care of. Appellants would have it that, even assuming their above general request was properly refused, they should have been allowed access to the testimony of Officer Kaczur. The complete answer to this is that in the judgment of the trial court the particularized need of it was not shown. Without question, this was a matter for the discretion of the judge. Our own examination of the trial record gives no indication that the court abused its discretion. St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936 (1894). United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 233, 60 S.Ct. 811, 84 L.Ed. 1421 (1940). Berry v. United States, 295 F.2d 192, 195 (8 Cir.1961).

■ Appellants argue that the convictions are not supported by sufficient evidence; that judgments of acquittal should have been granted. We have briefly stated a general outline of the Government evidence. While this is by no means all inclusive, the raw material from the record without inference or comment does reveal that the Government presented a case both on the conspiracy and substantive counts against all of the appellants that fully justified its submission to the jury. It was specially stressed on oral argument that the convictions of Abrams and Zoroiwchak are unsupported by evidence. This is not in accord with the record. Flounders testified that he remembered Abrams hitting him at the time, as he said, "When I was knocked out of the Union Hall? * * * Physically knocked out * * * And the only thing I remem-

ber before I became unconscious was these men hitting me." He identified the men who hit him as being present in the court room. He was asked, "Will you point them out by number?" He answered "I remember Bill McCabe hitting me." He was next asked "Which other?" A. "I remember Abrams." Q. "Which one is Abrams?" A. "Next to Toots Bertucci."

Flounders was also asked "With reference to your testimony before the Grand Jury you refer to a person called John Zoroiwchak. Is he in the courtroom?" A. "Yes, he is." Q. "Will you point him out sir?" A. "The third man from the end." Officer Kaczur who was outside the union hall at the time of the meeting identified Zoroiwchak as one of a group of men wearing Teamster 107 jackets standing on the corner of Spring Garden and Hope Streets adjacent to the hall. He said there was a big commotion and the men with the 107 insignia ran in the direction of the commotion. He identified McCabe, Abrams and Zoroiwchak as in that group. Kaczur and his partner Gordon followed and "By the time we broke this what you call mob, got in the center of the circle, there was a man lying on the highway." That man was Flounders. A half hour later he saw the same group heading for Second and Spring Garden Street. He said "That crowd was going to 2nd and Spring Garden St. and they were going after four men and got out of a car at 2nd and Spring Garden * * *." Kaczur testified that he and Gordon told the extra police who had come on the scene "on the assist call" to disperse that crowd. The crowd dispersed and stood on the union parking lot. Kaczur and Gordon told the other police to disperse the crowd out of the area or have them go into the union hall. The crowd "Approximately the crowd that was hanging on the corner, about 15, 20 men. * * * They all went—started going to their cars and they were taking baseball bats out of their cars and they were taking the baseball bats into the union hall." He

specifically saw McCabe, Abrams and Zoroiwchak in that crowd and had seen them prior to that, running between the parked cars. He stated that he saw them enter the union hall with baseball bats. Officer Gordon, who testified even more carefully than Kaczur, substantially corroborated the latter's evidence. Gordon was the one whom the witness Donnelly said he saw, pushing a man back who was " * * * like hitting—to hit Flounders." Donnelly stated that Gordon said to the man "That's enough, Bill." It seems to us, as we have above noted, that with reference to Abrams and Zoroiwchak, as with the other appellants, the evidence and the fair inferences therefrom called for submission to the jury of the charges remaining against them. The 17th count of the indictment, a substantive charge against Zoroiwchak involving Mrs. McKay, had been dismissed by the court at the conclusion of the testimony.

Appellants would have it that Bertucci and McCabe struck Flounders in self-defense and not with the specific intent of enjoining him from attending the meeting. In addition to Flounders' trial testimony, the other evidence above noted concerning the episode was before the jury for its consideration. The evidence as a whole, to say the least, was quite sufficient for that body to decide as it did that the expressed purpose of Bertucci and the others involved in the Flounders incident was to attempt to bar him from the meeting and the exercise of his membership rights, which attempt was entirely successful. The effort to suggest that what Bertucci and McCabe did to Flounders was in self-defense was before the jury in connection with all the other evidence as to the episode. Appellants' requests to charge their requests 20, 21 and 22, dealing with that situation did not accurately present the actual legal and evidential picture. They were rightly denied. 23 and 27 are broader in scope; they suffer from the same basic defects. Request 25 was substantially covered in the

charge. There was no specific objection to the refusal to charge it or 27. Neither one of them is legitimately before us.

██ Appellants contend that their requests for instructions 10 and 24 were erroneously refused. These dealt with advice of counsel to the Local. The trial record does not support those requests. There was no error in refusing request 26 that neither the union nor Mullen was on trial. The charge made it very clear just who was on trial. Request 19, with reference to testimony previously given by Flounders, was erroneous as presented. We find no material error in the court's handling of the reading of Flounders' Grand Jury testimony. There was no objection by the defense to the use of the testimony, it participated in that use. The judge specifically told the jury:

> "Ladies and gentlemen of the jury, by agreement of counsel and you are ordered by the Court that the reading of the testimony of this witness before the Grand Jury is not evidence but is purely for the purpose of refreshing this witness' recollection of his testimony at that time as to what he said, as to his testimony before the Grand Jury."

There was no objection to this by the defense or suggestion of additional language, etc. United States v. 5 Cases, etc., 179 F.2d 519 (2 Cir.1950).

██ Appellants assert that the conclusion of Judge Luongo in Axler v. Transportation Checkers, etc. (C.A. 30762 E.D.Pa.) should have precluded prosecution. The theory of this seems to be that any concept of wilfulness was eliminated from the case by Judge Luongo, therefore the judgment in Axler bars this action. No real support is produced for that view. What is offered is an involved speculative theory which cannot be accepted as authority for holding that Axler controls this prosecution. The Government was not a party to that civil litigation. The judgment there cannot be res judicata or estoppel of the prosecution in this case

" * * * because the parties plaintiff in the two suits are neither the same nor in privity * * * and the nature of the actions are entirely different." Dranow v. United States, 307 F.2d 545, 557 (8 Cir.1962). And see Sam Fox Publishing Co., Inc. v. United States, 366 U.S. 683, 689–690, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). United States v. Leventhal, 114 U.S.App.D.C. 340, 316 F.2d 341, 346 (D.C.Cir.1963). The plaintiffs in the Axler suit were concerned with equitable remedies as related to their private rights. Here the Government sought to punish appellants for their public offenses.

Even the immediate issues before the court in Axler did not touch the criminal violations of the Local's members rights under the Labor Management Act upon which this prosecution is based. And the court there specifically stated in the very order upon which appellants rely that it was not passing upon " * * * whether the individual rights of those persons were violated such as to give them individual causes of action under the Act."

██ Appellants assert that the statute, 29 U.S.C.A. § 530, under which appellants were convicted, does not govern their conduct as revealed by the record. The further claim is made that if it does, it is unconstitutional. It is said that Section 530 which makes it unlawful for any person through threats or the use of force and violence to attempt to or to in fact interfere with or prevent the exercise of any or all rights that a union member may have under any of the titles of the Act, must be read in some sort of restrictive fashion which would eliminate Bertucci and Doherty as paid employees of the Local and McCabe, Abrams and Zoroiwchak as nonmembers. We have held expressly to the contrary in Tomko v. Hilbert, 3 Cir., 288 F.2d 625, 627 (1961). There we distinguish sharply between the civil enforcement provisions of the bill of rights under Title I of the Act, Section 102, 29 U.S.C.A. § 412 and Title II of the Act which is what governs

this appeal. We say 288 F.2d pp. 626–627:

"In contrast, Title II, 73 Stat. 524, 29 U.S.C.A. § 431 et seq., which imposes a duty on labor organizations, their officers and employees, and employers to prepare and file certain enumerated reports, can be enforced by a civil action under section 210, 29 U.S.C.A. § 440, against *any person*. Also, criminal sanctions are contained in section 610, 29 U.S.C.A. § 530, which makes it unlawful for *any person* through threats or the use of force or violence to attempt to or to in fact interfere with or prevent the exercise of any or all rights that a union member may have under any of the titles of the LMRDA."

We say further 288 F.2d pp. 628–629:

"To sum up, the LMRDA gives to the individual union members certain rights which when interfered with by a union, its officials or its agents, can be redressed civilly against them. In addition, there are criminal sanctions imposed against *any person* who interferes with those rights."

Our above view was followed in United States v. Roganovich, 318 F.2d 167 (7 Cir.1963), cert. den. 375 U.S. 911, 84 S.Ct. 206, 11 L.Ed.2d 150 (1963). There a member at a meeting of his local commented adversely on a report from the Business Representative. One of the defendants, a member of the local, and the other, a member of another local, attacked the speaker. The first one hit him with his fist and staggered him, the other one jumped on his back, brought him to the floor and then kicked him. Neither of the defendants was charged as being in any way connected with any officer or agent of the union. Both were charged merely as individuals. They were indicted, as here, under 29 U.S.C.A. §§ 411(a) (2) and 530, and thereafter convicted. The court held 318 F.2d p. 170:

"We cannot agree with defendants' construction of § 530 as merely the criminal counterpart of, and no broader than, the civil enforcement section, § 412. Section 412 refers to infringement of rights by any violation of the subchapter. Section 530 deals only with use or threat 'of force or violence, to restrain' etc.

"As urged by both parties, we have studied the legislative history of the Act. We conclude that Congress was seeking to preserve for union members the right of free expression secure from interference by force or threat of force from *any person*, not merely from union agents or those acting on behalf of, or in concert with, them. Thus we must also conclude that § 530 as construed by the Trial Court, contrary to defendants' assertions, does bear a reasonable relationship to the ends sought to be achieved by Congress."

Appellants idea of the unconstitutionality of the statute is based upon their unwarranted hypothesis that in this appeal criminal sanctions were imposed as a result of "a brawl among members". The so-called "brawl" was found by the jury to have arisen out of appellants' conspiracy to prevent and actually preventing persons named in the indictment from exercising their right to attend and participate in the membership meeting of Local 161 and to express their views upon matters properly before the meeting. Similar circumstances were present in Roganovich. Both indictments and trials were directly under Title II of the Act and in accord with its letter and spirit.

This appeal has been presented and argued most competently and thoroughly on behalf of appellants. The latter were given a meticulously fair trial in the district court by Judge Bohanon and the jury. There were no trial errors of any substance. The evidence adequately sustains the jury verdicts in all instances. The judgment of the district court will be affirmed.